**DISTRICT 65, UAW, et al., Plaintiffs,**

v.

**HARPER & ROW, PUBLISHERS, INC., et al., Defendants.**

**Raymond C. HARWOOD, et al., Plaintiffs,**

v.

**HARPER & ROW, PUBLISHERS, INC. et al., Defendants.**

Nos. 82 Civ. 3657 (KTD), 82 Civ. 4042 (KTD).

United States District Court, S.D. New York.

Dec. 30, 1983.

Mittelman & Gordon, Washington, D.C., for plaintiffs Dist. 65, UAW, et al.; Eugene Mittelman, Michael S. Gordon, Washington, D.C., of counsel.

Eisner & Levy, P.C., New York City, for plaintiffs; Eugene G. Eisner, Richard Levy, New York City, of counsel.

Shea & Gould, New York City, for plaintiffs Harwood, et al.; Ralph Ellis, Arthur Felsenfeld, Martha Cohen Kurshan, New York City, of counsel.

Weil, Gotshal & Manges, New York City, for defendants Harper & Row, Publishers, Inc. and Asnes, Bessie, Canfield, Clark Knowlton, B. Lippincott, J. Lippincott, Michelson, Thomas, Cannon, Logan Miller, Aksen, Hutton, Isay and Taylor; Dennis J. Block, Nancy E. Barton, Bonnie K. Wachtel, New York City, of counsel.

Cravath, Swaine & Moore, New York City, Faegre & Benson, Minneapolis, Minn., for defendants Minneapolis Star & Tribune Co., John Cowles, Jr., and Otto A. Silha; Thomas D. Barr, Robert D. Joffe, Turner P. Smith, New York City, Lawrence C. Brown, Minneapolis, Minn., of counsel.

Lawrence F. Landgraff, Henry Rose, James N. Dulcan, Stephen D. Schreiber, Jeffrey Endick, Washington, D.C., of counsel, for Pension Benefit Guaranty Corp.

Reboul, MacMurray, Hewitt, Maynard & Kristol, New York City, for defendant The Prudential Ins. Co. of America; Howard G. Kristol, New York City, of counsel.

## OPINION & ORDER

KEVIN THOMAS DUFFY, District Judge:

These two actions arise primarily from a transaction finalized on December 9, 1981 in which Harper & Row, Publishers, Inc. ("Harper & Row") terminated its Retirement Plan, liquidated the fund and recaptured the excess contributions in order to purchase approximately one-third of the outstanding shares of Harper & Row stock from defendant Minneapolis Star & Tribune Company ("MST") after being notified by MST that it intended to sell the stock. The plaintiffs in the first action ("District 65 action") include District 65 of the United Auto Workers Union ("District 65") which represents approximately 15 percent of Harper & Row's employees and Renee Cafiero and William Monroe who are Harper & Row employees and participants of the employee benefit plans. The second action ("Harwood action") was commenced by Raymond Harwood, a stockholder, former president of Harper & Row and participant in the Retirement Plan. The two other plaintiffs in the Harwood action, Carolyn Reed and Glen Howard, were formerly associated with Harper & Row and are participants in the Retirement Plans. The defendants in both actions are the same with three exceptions. The defendants in common include Harper & Row, MST, and directors on the Board of Directors of Harper & Row.[1] Two of the MST defendants in both actions are John Cowles, Jr. and Otto A. Silha who were directors of Harper & Row between February 1, 1981 and July 28, 1981. During this time, they were also directors of MST. Fred A. Taylor, a defendant in the Harwood action, was a director of Harper & Row until August 31, 1981.

Defendants Harper & Row and MST move to dismiss and move for summary judgment in both actions. Defendants Prudential Insurance Company of America ("Prudential") moves alternatively to dismiss and for summary judgment in the District 65 action. The Pension Benefit Guaranty Corporation ("PBGC") moves to dismiss the District 65 Complaint. Defendant Fred Taylor moves alternatively to dismiss and for summary judgment in the Harwood action. Plaintiff UAW moves for summary judgment on its complaint. Additionally, there are several miscellaneous motions pending that concern discovery, amendments to complaints, and class claims.

## I.

### FACTS

In February 1981, MST notified Harper & Row that it intended to dispose of its entire position in Harper & Row which consisted of 1,017,630 shares of stock. The MST holdings represented one-third of the outstanding shares of Harper & Row stock. After learning of MST's decision to sell its shares of Harper & Row stock, a committee of outside directors was formed by Harper & Row to review the possibility of purchasing the stock from MST.[2] The Board of Directors of Harper & Row engaged Kidder, Peabody & Co. ("Kidder, Peabody"), an investment banking firm, to render a financial opinion regarding the feasibility of purchasing the MST shares.

Harper & Row planned to finance the stock purchase in part by terminating the Harper & Row Publishers, Inc. Retirement Plan.[3] After purchasing annuities to pro-

---

1. Several of the defendant directors served on the Retirement Plan Committee, the Profit Sharing Committee, the Audit Committee which reviewed funding and investments of the employee benefit plans, and the committee of outside directors responsible for reviewing the proposed transactions involving the MST shares. Fred A. Taylor was a former director and member of the "outside" committee. Prudential Insurance Company of America ("Prudential") and the Pension Benefit Guaranty Corporation ("PBGC") are named as defendants in the District 65 action.

2. The committee of outside directors consisted of defendants Marvin A. Asnes, Kenneth B. Clark, Gertrude G. Michelson, and Fred A. Taylor.

3. The Retirement Plan is a defined employee pension benefit plan within the meaning of ERISA §§ 3(2) and 3(35), 29 U.S.C. §§ 1002(2) and 1002(35). The plan was sponsored by Harper & Row and administered by a Retirement Plan Committee. The assets of the Plan were held in a trust fund.

vide for the present value of accrued benefits for all employees covered by the Retirement Plan, Harper & Row anticipated an excess fund of $10.2 million. The balance of the purchase price was to be financed from the sale of real property ($5 million), the purchase of Harper & Row stock by the Harper & Row employee profit-sharing plan ($2 million) and loans ($3.1 million). *See* Letter from Norman L. Cannon, Vice President and Treasurer, Harper & Row, to MST (September 15, 1981) (Plaintiff District 65 Exh. 9).[4]

Harper & Row thereafter commenced negotiations with MST in July 1981 for the purchase of the shares held by MST and in August 1981 a tentative agreement was reached. In August, the Harper & Row stockholders, current employees and retirees were notified about the tentative agreement and a notice of intent to terminate the Retirement Plan was filed with the PBGC. Harper & Row also applied to the Internal Revenue Service ("IRS") for a determination that the termination of the Retirement Plan would not adversely affect its qualified status under the Internal Revenue Code.

On November 6, 1981, the PBGC issued a Notice of Sufficiency pursuant to Employee Retirement Income Security Act ("ERISA") § 4041(b), 29 U.S.C. § 1341(b), which stated that the assets of the Plan would be sufficient to satisfy all obligations concerning guaranteed benefits. Affidavit of Edward A. Miller ("Miller Affidavit"), Exh. J. On November 20, 1981, the IRS issued a determination letter finding that the termination of the Retirement Plan "does not adversely affect its qualification for Federal tax purposes." Miller Affidavit, Exh. K. The Retirement Plan was terminated effective August 31, 1981. In an agreement

dated September 15, 1981, Harper & Row agreed to purchase the 1,017,630 shares of stock at the price of $20 per share. On the same day the Board of Directors held a regular quarterly meeting. At the meeting, the resignations of Directors John Cowles, Jr., Otto A. Silha, and Fred A. Taylor were recorded. The Board also ratified the Plan to purchase the MST shares and the proposed financing of that purchase.

On September 15, 1981, Kidder, Peabody submitted its opinion to Harper & Row in which it stated that "(i) the purchase is an action that the Company can reasonably take without materially and adversely affecting its financial ability to carry out its present plans, and (ii) the Purchase Price represents a fair value for the Shares." Miller Affidavit, Exh. F. On October 7, 1981 the Board of Directors held a special meeting to review the purchase plan and the dissemination of information to shareholders concerning the proposed changes in the employee benefit plans. *See* Miller Affidavit, Exh. G. On December 9, 1981, the Harper & Row shareholders approved the proposed transactions at its annual meeting. To fund the benefits accrued in the Plan, Harper & Row entered into a contract with Prudential to purchase annuities for the present value of the accrued benefits for those members in the Plan whose accrued benefits had a present value of at least $1,000 and to pay lump-sum amounts to the other participants. The arrangement with Prudential was later amended and those participants with an accrued present value of between $250 and $1,000 could opt to either receive a lump-sum payment or an annuity. As a result of this transaction, approximately $9 million was

---

**4.** The financing of the proposed purchase of the MST shares was also outlined in a letter dated June 19, 1981 from Brooks Thomas to defendants John Cowles, Jr. and Otto A. Silha. The letter stated in part:

The Company's Retirement Plan, the asset value of which exceeds the value of benefits accrued under it by approximately $5 million, would be terminated. Individual annuities would be purchased for each employee out of the proceeds at prevailing interest rates,

which are substantially higher than the funding assumptions used in the existing plan. Because of this differential, as well as the generally low age level of our employees, such annuities could be purchased for approximately $4 million less than the amount currently accrued in the Plan. After purchasing such annuities, the trustee would thus have cash remaining amounting to approximately $9 million.

Plaintiffs' Exh. 6.

recaptured by Harper & Row after the retirement fund was liquidated.

Two other transactions are challenged by plaintiffs. Harper & Row's Profit-Sharing Plan purchased 152,588 of the 1,017,633 shares from Harper & Row for approximately $11⅝ per share for a total of $1.8 million. This purchase occurred after the Profit-Sharing Plan was amended to allow an investment of up to $2 million, but not more than one-half of the Plan assets, in Harper & Row shares.[5] The amended Profit-Sharing Plan provided that the price was to be determined by the average of the bid and asked quotation for Harper & Row shares reported in the over-the-counter market at the close of business on the day preceding the purchase. The amendment was approved by the Board of Directors on October 7, 1981 and reviewed again on December 9, 1981. Harper & Row's last transaction relevant to this dispute was the establishment of an Employee Stock Plan by a contribution of 865,045 Harper & Row shares. The creation of the Employee Stock Plan was approved by the Board on October 7, 1981 and approved by the shareholders on December 9, 1981.

## II.

### DISCUSSION

The District 65 plaintiffs and the Harwood plaintiffs assert a variety of claims in their complaints arising out of the purchase by Harper & Row of over one million shares of Harper & Row stock held by MST, and the related transactions involving the Retirement Plan, Profit Sharing Plan and Employee Stock Plan. Plaintiffs in both actions allege that defendants' conduct violated ERISA. The District 65 plaintiffs allege in their proposed amended complaint violations of the federal and state securities laws and common law. As preliminary matters, District 65's motion for leave to amend its complaint, the con-

solidation of the two actions and the class action motions will be discussed.

**A. District 65's Motion to Amend Its Complaint**

The District 65 complaint was filed on June 3, 1982. A motion was thereafter filed on February 3, 1983 for leave to file an amended complaint. On April 26, 1983 plaintiffs filed a motion to amend the proposed amended complaint to add another subparagraph. Basically, the District 65 plaintiffs seek to add (1) an allegation that there was a breach of ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D), by the failure of the Trustee of the Profit-Sharing Plan Trust Agreement, Manufacturers Hanover Trust, to exercise independent authority and discretion concerning the purchase of the MST shares;[6] (2) an allegation that there exists an implied covenant not to terminate the Plan for other than legitimate business reasons and that this covenant was breached; (3) a claim based on common-law fraud; (4) claims under ERISA § 510, 29 U.S.C. § 1140; (5) an allegation of tortious interference with a contract and with existing rights under the retirement and profit-sharing plans; (6) a claim alleging a breach of District 65 collective bargaining agreement with Harper & Row; and (7) an allegation that the Internal Revenue Code § 401 was violated by Harper & Row.

■ Fed.R.Civ.P. 15(a) provides that leave to file an amended complaint should "be freely given when justice so requires ...." Leave to file an amended complaint is therefore granted freely absent bad faith, undue delay or prejudice to the opposing party. *See Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).

■ Defendant has not argued that it would suffer any prejudice or that the motion to amend is motivated by bad faith.

---

**5.** Harper & Row maintained a profit-sharing plan which was an individual account employee pension benefit plan as defined by ERISA § 3(2) and 3(34), 29 U.S.C. §§ 1002(2) and 1002(34). Prior to the amendment of the profit-sharing

plan, Harper & Row contributed 10 percent of its pretax profits to the plan each year.

**6.** In their proposed amended complaint, the District 65 plaintiffs seek to add Manufacturers Hanover Trust Company as defendant.

Defendant argues that District 65's motion to amend should be denied because the addition of the "claims for relief would serve no useful purpose whatsoever" and because the proposed claims fail to state a claim upon which relief can be granted. Although the legal sufficiency of the proposed amended complaint may be tested on a motion to amend, I will grant the motion to amend and consider the amended complaint on defendants' motion to dismiss. *See Campbell v. A.C. Petersen Farms, Inc.,* 69 F.R.D. 457, 460 (D.Conn.1975).

### B. Consolidation and Class Action

Defendants Harper & Row and Prudential move for an order dismissing plaintiffs' class claims.[7] Because both the District 65 and the Harwood actions were instituted as class actions, the possibility of consolidation should be explored first. Fed.R.Civ.P. 42(a) provides that "[w]hen actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any and all matters in issue in the actions [or] it may order all the actions consolidated ...." Consolidation is a device that promotes judicial economy but does not change the rights of the parties in the separate suits. *See Cole v. Schenley Industries, Inc.,* 563 F.2d 35, 38 (2d Cir.1977).

■ The Harwood and District 65 actions are consolidated in order to avoid duplication of discovery. There are questions of law and fact common to both actions and no prejudice to the plaintiffs or defendants would result from the consolidation. *See Lloyd v. Industrial Bio-Test Laboratories, Inc.,* 454 F.Supp. 807, 812 (S.D.N.Y.1978); *Torres v. Sachs,* 381 F.Supp. 309, 311 (S.D.N.Y.1974) (even where defendants are different, consolidation is proper where there are common questions of law and fact). Accordingly, the Harwood and District 65 actions are consolidated.

■ I turn to the issue of whether the action as consolidated will proceed as a

class action. The Harper & Row defendants move to dismiss plaintiffs' class claims in both actions. Prudential moves to dismiss plaintiffs' class claims in the District 65 action. Fed.R.Civ.P. 23(c)(1) which provides that "[a]s soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained." In order to maintain an action on behalf of a class, the proposed representative must allege that "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a). The District 65 plaintiffs allege the above elements but defendants argue only that leave to amend should be denied because plaintiffs failed to make the appropriate motion under the local court rules.

■ The Court Rules for the District Court in the Southern District of New York provides that the party asserting a class claim "shall move" within 60 days after filing the pleading in which the class claims are asserted. Rule 4(c). Rule 4(d), however, provides that the opposing party shall move within 30 days thereafter to dismiss the action as a class action. In the interests of judicial economy, I find that the absence of a formal motion by plaintiffs is not fatal. Because insufficient information was submitted by the parties, a determination as to class action status is postponed pending the submission by plaintiffs of information concerning the size and composition of the class and the possible methods of notification of such members.

### C. Motions to Dismiss/Motions for Summary Judgment

Motions to dismiss pursuant to Fed.R. Civ.P. 12(b)(6) and motions for summary

7. Defendants move pursuant to Fed.R.Civ.P. 26 to stay discovery pending the disposition of the

motions. The motions are denied as moot.

judgment pursuant to Fed.R.Civ.P. 56(b) have been made by several parties including plaintiff District 65 and defendants PBGC, Harper & Row, MST, Prudential, and Taylor.

■ In considering a motion to dismiss, the complaint should not be dismissed unless it appears that the plaintiffs could "prove no set of facts in support of [their] claim[s] which would entitle [them] to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

The standard governing a summary judgment motion is that the motion must be denied when there exists a genuine issue of disputed material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The movant has the burden of establishing that there is no disputed material fact and that he is entitled to judgment as a matter of law. *Id.*

1. District 65's Standing Under ERISA

Defendants move to dismiss the ERISA claims asserted by District 65 on the ground that District 65 has no standing. ERISA § 502(a), 29 U.S.C. § 1132(a) provides that an action may be brought by a "participant, beneficiary or fiduciary."

■ District 65 has no standing under the clear language of ERISA § 502(a) to assert claims under ERISA. District 65 is not a participant, beneficiary or fiduciary. *See* ERISA § 3(7), (8), (21), 29 U.S.C. § 1002(7), (8), (21). It therefore has failed to state a claim upon which relief can be

granted on such claims.[8] The individual plaintiffs in the District 65 action, however, are proper plaintiffs. Throughout this opinion, any reference to the "District 65 plaintiffs" on the ERISA claims should be read to mean only the individual plaintiffs.

Additionally, District 65 argues that District 65 has standing and the court has jurisdiction with regard to the ERISA claims because it is merely representing its members who do qualify under ERISA § 502(e), 29 U.S.C. § 1132(e). The adoption of this argument would render the explicit language used in ERISA meaningless. Additionally, District 65 represents only a small portion of Harper & Row's employees who are participants or beneficiaries.

■ In the Harwood actions, two of the plaintiffs, Harwood and Howard, are not "participants, beneficiaries, or fiduciaries" with respect to the Profit-Sharing or Employee Stock Plans. They are therefore dismissed as party plaintiffs on the claims relating to ERISA violations of those two plans.

2. Termination of the Retirement Plan

The Retirement Plan provides for its termination and outlines the procedure by which the benefits are allocated upon termination. Section 9.01 provides that "[w]hile the plan is intended to be permanent, an Employer may terminate or partially terminate the Plan at any time." Miller Affidavit, Exh. I. The Trust Fund may

---

8. Assuming *arguendo* that District 65 has standing it appears that the court lacks subject matter jurisdiction over District 65's ERISA claims. ERISA § 502(e), 29 U.S.C. § 1132(e) provides that "[e]xcept for actions under subsection (a)(1)(B) of this section, the district courts of the United States shall have exclusive jurisdiction of civil actions ... brought by the Secretary, or by a participant, beneficiary or fiduciary."

In *Pressroom Unions-Printers League Income Security Fund v. Continental Assurance Co.*, a case involving jurisdiction under ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1), the court stated:

[w]e focus not on whether the legislative history reveals that Congress intended to *prevent* actions by employers or other parties, but

instead on whether there is any indication that the legislature intended to *grant* subject matter jurisdiction over suits by employers, funds, or other parties not listed in section 1132(e)(1).

700 F.2d 889, 892 (2d Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 148, 78 L.Ed.2d 138 (1983). Plaintiff District 65 argues that *Pressman* left open the question of establishing jurisdiction under 28 U.S.C. § 1331, *see* 700 F.2d at 892 n. 7, and that in the event that ERISA did not provide subject matter jurisdiction to the court over District 65's ERISA claims, 28 U.S.C. § 1331 would. It is unnecessary to address jurisdiction under 28 U.S.C. § 1331 in light of the fact that District 65 has already been dismissed as a plaintiff on the basis of lack of standing.

then be liquidated subject to the approval of the PBGC and IRS. *Id.* § 9.04.

ERISA § 4041, 29 U.S.C. § 1341 provides that the Plan administrator shall file a notice of termination with the PBGC prior to the effective date of termination. Plaintiffs filed its notice of intent to terminate its Plan effective August 31, 1981. *See* Plaintiffs' Exh. 10. In accordance with section 4041(b), the PBGC notified Harper & Row that "the assets of th[e] Plan will be sufficient as of your proposed date of distribution to discharge when due all obligations of the Plan with respect to guaranteed benefits." Miller Affidavit, Exh. J.

Acknowledging the right to terminate generally, District 65 Memorandum, at 63, it is asserted that under the circumstances in this case by terminating its Plan, Harper & Row violated ERISA's fiduciary standard contained in sections 403(c)(1) and 404(a)(1)(A)–(D).

The standard of conduct expected of fiduciaries under ERISA is as follows:

> Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> (A) for the exclusive purpose of:
>
> (i) providing benefits to participants and their beneficiaries; and
>
> (ii) defraying reasonable expenses of administering the plan;
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
>
> (C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
>
> (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter or subchapter III of this chapter.

ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1); *see Donovan v. Bierwirth*, 538 F.Supp. 463, 471 (E.D.N.Y.1981), *aff'd*, 680 F.2d 263 (2d Cir.1982), *cert. denied*, —— U.S. ——, 103 S.Ct. 488, 74 L.Ed.2d 631 (1983). Section 403(c)(1) of ERISA sets forth an additional fiduciary obligation. It provides that the assets of the Plan "shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries. ERISA § 403(c)(1), 29 U.S.C. § 1103(c)(1).

Plaintiffs assert that the "Harper & Row and the MST defendants ... entered into a scheme to prevent any third party from obtaining control of Harper & Row." District 65 Complaint, ¶ 36; *see* Harwood Complaint, ¶ 28. The "scheme" referred to by plaintiffs consisted mainly of the Retirement Plan termination. Plaintiffs allege that with the exception of PBGC the defendants failed to discharge their duties as fiduciaries of the Retirement Plan, the Profit-Sharing Plan and/or the Employee Stock Plan solely in the interest of the participants and beneficiaries. District 65 Complaint, ¶ 78 (ERISA § 404(a)(1)(A)). Further, plaintiffs allege that by allowing the assets of the plans to "inure to the benefit of the employer," the fiduciaries have violated ERISA. District 65 Complaint, ¶ 80 (ERISA § 403(c)(1)). Additionally, plaintiffs in both the District 65 and Harwood actions claim that the Plan fiduciaries "failed to discharge their duties with the [same] care, skill, prudence and diligence" as would be exercised by a prudent man. District 65 Complaint, ¶ 82; Harwood Complaint, ¶ 33 (ERISA § 404(a)(1)(B)).

■ In opposition to District 65's motion for summary judgment and in support of its own motion, Harper & Row argues that ERISA's fiduciary standard has no application to a decision to terminate its pension plan. For the following reasons, I hold that the decision to terminate the Retirement Plan is exempt from ERISA's fiduciary standards. The termination provisions in the Plan and ERISA appear to be predi-

cated on the voluntary nature of such plans. For example, section 9.01 of the Plan provides that the Plan can be terminated by Harper & Row at any time. Further, the sections in ERISA dealing with fiduciary obligations contain exceptions when the challenged conduct involves termination. ERISA § 403(c)(1), 29 U.S.C. § 1103(c)(1) states that "[e]xcept as provided in ... sections 1342 and 1344 of this title (relating to termination of insured plans), the assets of a plan shall never inure to the benefit of any employer ...." Additionally, ERISA § 404, 29 U.S.C. § 1104 contains the qualification that it is "[s]ubject to sections 1103(c) and (d), 1342, and 1344 of this title." 29 U.S.C. § 1104.

Finally, ERISA § 406, 29 U.S.C. § 1106, barring the fiduciaries from entering into certain transactions, has no application by reason of the exemptions set forth in ERISA § 408, 29 U.S.C. § 1108. In particular, ERISA § 408(b)(9) states that the prohibited transaction provisions in section 406 are not applicable to the "making by a fiduciary of a distribution of the assets of the plan in accordance with the terms of the plan if such assets are distributed ... under section 1344 ...." 29 U.S.C. § 1108(b)(9); *see Van Orman v. American Insurance Co.*, 680 F.2d 301, 313 (3d Cir. 1982) (dicta) (Congress intended the statutory provisions prescribing minimum standards of fiduciary conduct to govern employees' *pre-termination* rights to the fund's assets, whether surplus or not.) *See also* Hearings Before U.S. House of Representatives' Select Comm. on Aging (Sept. 28, 1983) (Statements of S. Allen Winborne and Alan D. Lebowitz).

Thus, the District 65 and Harwood plaintiffs erroneously seek to have the fiduciary provisions in ERISA applied to the decision to terminate and the arrangements made as a consequence to that decision. Accordingly, plaintiffs' claims are dismissed for failure to state a cause of action to the extent that a breach of fiduciary duty was alleged to have occurred by reason of Harper & Row's decision to terminate the Retirement Plan.

### 3. Reversion of Excess Assets to Harper & Row

Plaintiffs allege that a breach of ERISA's minimum standards for fiduciaries occurred when the surplus assets reverted to Harper & Row upon the termination of the Plan. For the following reasons, I find that these claims for breach of fiduciary duty must be dismissed insofar as they relate to Harper & Row's right to recapture the surplus assets. I note, however, that the question concerning how much of the assets are "surplus" and how much should have been paid out to beneficiaries is a separate issue. I turn first to Harper & Row's surplus recapture rights.

The Harper & Row Plan and ERISA explicitly provide for the recapture of surplus assets by the employer after a pension plan has been terminated and accrued benefits have been allocated. *See* ERISA § 4044, 29 U.S.C. § 1344; Plan § 9.05, Miller Affidavit, Exh. I.

ERISA § 4044(d), 29 U.S.C. § 1344(d)(1), provides that the "[r]esidual assets of a plan may be distributed to the employer if—(A) all liabilities of the plan to participants and their beneficiaries have been satisfied, (B) the distribution does not contravene any provision of law, and (C) the plan provides for such a distribution in these circumstances."

The first condition requires that the "liabilities of the plan to participants and their beneficiaries have been satisfied." ERISA § 4044(d)(1)(A), 29 U.S.C. § 1344(d)(1)(A). Harper & Row entered into a contract with Prudential under which accrued benefits were paid either in the form of an annuity or a lump-sum payment. The sufficiency of the satisfaction of plan liabilities is challenged by plaintiffs on the ground that the individuals opting for a lump-sum payment and those only entitled to a lump-sum payment received less than they should have as a result of the utilization of a 15 percent interest rate. The interest rate assumed in the computation of the annuities and lump-sum payments will be discussed in the next section.

The second condition is that the distribution of excess assets to Harper & Row does not contravene any provision of law. ERISA § 4044(d)(1)(A), 29 U.S.C. § 1344(d)(1)(A). The recapture of funds by employers who have overfunded plans through actuarial error has been recognized as permissible under ERISA. *See Pollock v. Castrovinci,* 476 F.Supp. 606, 616 (S.D.N.Y.1979), *aff'd mem.,* 622 F.2d 575 (2d Cir.1980); *Washington-Baltimore Newspaper Guild Local 35 v. Washington Star Company,* 555 F.Supp. 257, 258 (D.D. C.1983).[9]

The third condition set forth in subdivision (C) of ERISA § 4044(d)(1) is satisfied. Section 9.05 of the Harper & Row Retirement Plan permits a reversion of excess assets to the employer upon the termination of the Plan "if all benefits have been allocated and distributed under this Article and all liabilities of the Plan to affected Members, Former Members and Beneficiaries have been satisfied."

■ Based on the foregoing, I find that Harper & Row had a right to the surplus assets remaining after the termination of the Plan and distribution of accrued benefits. The amount of a surplus that reverted to Harper & Row, however, is in issue. Plaintiffs contend that Harper & Row reaped a windfall by minimizing the expense of providing the value of the accrued benefits to Plan participants. This issue will be discussed in the next section.

### 4. Purchase of Annuity Contract

A bid was solicited from Prudential in August, 1981 for the purchase of annuities covering all accrued benefits under Harper & Row's Retirement Plan. *See* Plaintiff District 65 Exhs. 14, 18–25; Miller Affida-

vit, Exh. L. A bid was submitted and a contract was entered into for the purchase of a group annuity contract. Under the contract, as amended, those participants in the plan with an accrued present value of $1,000 or more receive an annuity and those with accrued benefits between $250 and $1,000 have the option of receiving either an annuity or a lump-sum payment. Finally, those members with less than $250 accrued benefits will receive a lump sum amount.

■ In the District 65 Memorandum it is argued that ERISA was violated because the Plan requires that individual annuity contracts as opposed to a group contract be purchased. Section 9.04 of the Plan provides that the "allocated shares of each affected individual" shall be distributed in the method "to be selected in the case of each individual being in the complete discretion of the Committee." The two methods listed in section 9.04 include a lump-sum payment or "by the purchase of a non-transferable annuity contract." The purchase of a group contract rather than individual contracts by Harper & Row did not violate ERISA or the terms of the Plan.

■ The Harwood complaint contains an allegation that Harper & Row used an interest rate of 15 percent per year to calculate the present value of accrued benefits under the Plan in order to deprive plan participants of the actuarial equivalent of his or her accrued benefit. Harwood Complaint, ¶ 34. Harwood's argument is that by "choosing an interest rate which was grossly inflated," Harper & Row "minimized the present value of accrued benefits" and maximized the amount of resulting excess assets. *Id.* Plaintiffs allege

---

9. The District Court for the District of Columbia stated in *Washington-Baltimore Newspaper Guild Local 35 v. Washington Star Co.,* that "[i]n addition to section 4044(d)(1), the common law of trusts provides that an employer can retain such surplus .... These provisions are clearly intended to insure that while an employer is obligated to provide defined benefits to plan participants, the participants should not be able to claim a windfall stemming from the employer's accidental overfunding of a defined benefit plan." 555 F.Supp. at 560.

Excess assets that result from "erroneous actuarial computation" arise when the plan's "actual requirements differ from the expected requirements even though the latter were based upon previous actuarial valuations of liabilities or determinations of costs of providing pension benefits under the plan and were made by a [competent] person." 26 C.F.R. § 1.401–2(b)(1) (1981).

also that Harper & Row breached its fiduciary duties by failing to provide to the plan participants information necessary to make an informed decision of whether to select an annuity or lump-sum payment. Harwood Complaint, ¶¶ 36–37. District 65 alleges substantially the same facts and presents the same arguments in its amended complaint. *See* District 65 Complaint, ¶¶ 43–58.

Thus, plaintiffs in both actions argue that because a 15 percent interest rate assumption was used to calculate the lump-sum payments for those participants with accrued benefits under the $250 threshold or for those in the middle range who opted for the lump-sum payment, the lump-sum received by those participants was unreasonably small. Plaintiffs allege that the use of a 15 percent interest rate by Harper & Row was unfair to plan participants because they "could not be expected to earn more than about 7 percent, on a long-term basis, on the relatively small amounts paid to them in the form of lump sums." District 65 Complaint, ¶ 47.

There are several issues of fact that preclude the granting of the defendants' motions for summary judgment and dismissal on these claims. *See Jaroslawicz v. Seedman,* 528 F.2d 727, 731 (2d Cir.1975). First, although those participants with accrued benefits between $250 and $1,000 had the option of selecting an annuity based on the 15 percent interest rate or a lump-sum payment, it appears that the information supplied to the Plan participants may have been insufficient to enable them to make an informed decision. Harper & Row released memorandums on January 14, 1982 and April 16, 1982 to all of its employees outlining the relative benefits of annuities and lump-sum payments but failed to disclose the 15 percent interest rate assumption. *See* Miller Affidavit, Exhs. M, N.

Second, an issue of fact exists as to whether the rate of 15 percent was reasonable in light of the market conditions prevailing at the time that the Prudential contract was entered into. In a memorandum to the Retirement Plan Committee dated August 29, 1978, several indices for the determination of the interest rate were explored. Plaintiff District 65 Exh. 25. For example, the interest rates used in Moody's AAA Bond Index (8.6 percent in 1976) and by PBGC (6 percent) were suggested. *Id.* The reasons for the rejection by defendants of these lower rates is unclear. The PBGC regulations require that "reasonable actuarial assumptions as to interest and mortality" be used in the valuation of accrued benefits. 29 C.F.R. § 2619.26(b). The PBGC regulations provide that several interest rate assumptions, including "[t]he rate used by the insurer in the qualifying bid under which the plan administrator will purchase annuities not being paid as a lump sum" are "among those that will normally be considered reasonable." 29 C.F.R. § 2619.26(c)(2). Here, only one bid was solicited. Prudential's quotation, therefore, is only one factor which may be of limited usefulness to be used in determining the reasonableness of a 15 percent interest rate assumption. Defendants' motions to dismiss, and for summary judgment on plaintiffs' claims concerning the Prudential contract are denied.

### 5. Amendment to Profit-Sharing Plan

On October 7, 1981, the Board of Directors approved the amendment of Harper & Row's Profit-Sharing Plan. *See* Miller Affidavit, Exh. G. The amendments provide for the investment of up to $2 million in Harper & Row shares, not to exceed one-half of the Plan assets. Miller Affidavit, ¶¶ 24–25. On December 9, 1981 the Profit-Sharing Plan purchased 152,588 shares from Harper & Row for $1.8 million ($11⅝ per share). *Id.* ¶ 24. The District 65 complaint alleges that the Board of Directors did not act in the interest of Plan participants and beneficiaries in amending the Profit-Sharing Plan and acted instead to protect its position in the Harper & Row management. District 65 Complaint, ¶ 66; Harwood Complaint, ¶ 33. Plaintiffs allege further that defendants failed to investigate alternative investments and that the purchase of Harper & Row stock was an imprudent investment that resulted in a loss of $250,000. *Id.* ¶ 68. The Harwood plaintiffs claim that the stock purchase vio-

lates the ERISA's prohibited transaction fiduciary standard provisions. Harwood Complaint, ¶ 57. *See* ERISA § 406(A)(1)(D), 406(b), 29 U.S.C. § 1106(a)(1)(D), 1106(b).

I find these claims pertaining to the amendment of the Profit-Sharing Plan untenable in light of terms of the Plan and ERISA. The amendment of the Harper & Row Profit-Sharing Plan was in accordance with section 9.01 of the Profit-Sharing Plan which provides that the "Board of Directors may amend the Plan at any time and from time to time ...." *See* Plaintiff District 65 Exh. 3. Moreover, the purchase by the Plan of Harper & Row stock held by MST did not violate any provision of ERISA. ERISA § 408(e) provides that sections 406[10] and 407,[11] 29 U.S.C. §§ 1106 and 1107, do not apply to "the acquisition or sale by a plan of qualifying employer securities ... (3) if—(A) the plan is an eligible individual account plan." 29 U.S.C. § 1108(e). The definition of an "eligible individual account plan" under ERISA includes "(i) a profit-sharing, stock bonus, thrift or savings plan; (ii) an employee stock ownership plan" but excludes individual retirement plans. ERISA § 407(d)(3)(A), 29 U.S.C. § 1107(d)(3)(A). Harper & Row's Profit-Sharing Plan falls within the definition of an "eligible individual account plan" and is therefore not subject to the prohibited transactions sections.

Further, plaintiffs' claims under ERISA § 404(a)(1)(B) and (C), 29 U.S.C. § 1104(a)(1)(B) and (C)[12] are dismissed as those sections are made inapplicable to profit-sharing plans by ERISA § 404(a)(2), 29 U.S.C. § 1104(a)(2). ERISA § 404(a)(2) provides that "[i]n the case of an eligible individual account plan ..., the diversification requirement of paragraph (1)(C) and the prudence requirement ... of paragraph (1)(B) is not violated ...." 29 U.S.C. § 1104(a)(2).

Similarly plaintiffs' breach of fiduciary duty claims under sections 404(a)(1)(A) and (D)[13] are without merit. The fact that the purchase by the Profit-Sharing Plan of the Harper & Row stock also benefited Harper & Row does not necessarily result in a violation of the fiduciary standards or "exclusive purpose" provisions under ERISA. *See Donovan v. Bierworth,* 680 F.2d 263, 271 (2d Cir.1982), *cert. denied,* — U.S. —, 103 S.Ct. 488, 74 L.Ed.2d 631 (1983). Further, the Plan was amended in accordance with the terms of the Plan.

Accordingly, pursuant to Fed.R.Civ.P. 12(b)(6), defendants' motions to dismiss plaintiffs' claims concerning the Profit-Sharing Plan are granted. Claims I–IV in District 65's amended complaint and claims I–III, IX in the Harwood complaint insofar as they relate to the Profit-Sharing Plan purchase are therefore dismissed.

**10.** ERISA § 406 provides in part:
 (a) *Except as provided in section 1108* of this title:
 (1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—
 (D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan;

 (b) A fiduciary with respect to a plan shall not—
 (1) deal with the assets of the plan in his own interest or for his own account,
 (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

 (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.
29 U.S.C. § 1106. (emphasis supplied)

**11.** ERISA § 407(a), 29 U.S.C. § 1107(a) provides in part that
[e]xcept as otherwise provided in this section ... [a] plan may not acquire any qualifying employer security ... if immediately after such acquisition the aggregate fair market value of employer securities ... held by the plan exceeds 10 percent of the fair market value of the assets of the plan.

**12.** *See* text accompanying note 8 for the text of ERISA § 404, 29 U.S.C. § 1104(a).

**13.** *Id.*

### 6. Employee Stock Plan

On October 7, 1981, Harper & Row's Board of Directors approved the adoption of the Employee Stock Bonus Plan. The Stock Plan was "created to serve as a vehicle for indirect employee ownership" of the 865,045 shares of Harper & Row stock purchased from MST. Miller Affidavit, ¶ 34. The shareholders approved the stock plan and the MST purchase on December 9, 1981. The Harwood and District 65 plaintiffs claim that the defendants breached their fiduciary duties under sections 407(a)(2) and 406(b) by establishing a stock plan that was not approved under the Internal Revenue Code because more than 10 percent of the Plan assets consisted of the employer's stock. District 65 Complaint Claims I–III, VI; Harwood Claims I–III, VI, IX.

ERISA § 407(a)(2), 29 U.S.C. § 1107(a)(2) limits the amount of employer securities held by the Plan to 10 percent of the total Plan assets. This limitation, allegedly violated by the Stock Plan, is subject to an exemption for "eligible individual account plans." ERISA § 407(b)(1), 29 U.S.C. § 1107(b)(1). Plaintiffs argue that although the employee stock ownership plan ("ESOP") qualifies as an "eligible individual account plan," it must also qualify under section 401 of the Internal Revenue Code. *See* ERISA § 407(d)(3), (6), 29 U.S.C. § 1107(d)(3), (6). An ESOP is defined under ERISA § 407(d)(6) as being "an individual account plan—(A) which is a stock bonus plan which is qualified ... under section 401 of Title 26 ...." 29 U.S.C. § 1107(d)(6). *Donovan v. Cunningham,* 716 F.2d 1455 (5th Cir.1983), defined an ESOP as an employee benefit plan "designed to invest primarily in securities issued by its sponsoring company." *Id.* It is only one of the types of plans listed under the definition of "eligible individual account plan." *See* ERISA § 407(d)(3), 29 U.S.C. § 1107(d)(3). The first two of the three categories are "(i) a profit-sharing, stock bonus, thrift or savings plan; (ii) an employee stock ownership plan."

Plaintiffs argue that summary judgment must be denied because an issue of fact exists concerning whether the Employee Stock Plan would qualify under IRC § 401. In addition, plaintiffs allege that the Employee Stock Plan was created for the purpose of ensuring defendants' continued control over Harper & Row, and thus the "exclusive benefit" rule established by section 401 and income tax regulations, *see, e.g.,* Treas.Reg. § 1.401–1(a)(3)(ii) (1956), has not been complied with by defendants. Plaintiffs also challenge defendants' compliance with the Regulations' assumption that "plan" implies some measure of permanence and regularity. *See* Treas.Reg. § 1.401–1(b)(2) (1956). Defendant Harper & Row argues that the Employee Stock Plan is not an ESOP and does not therefore have to be tax qualified under the IRC § 401.

The parties' submissions, unfortunately, do not resolve the issue of whether Harper & Row's stock plan is an ESOP that must qualify under the IRC. Accordingly, summary judgment must be denied.

Assuming the factual issues are resolved, plaintiffs must establish a causal connection between the alleged breach of fiduciary duty and the losses incurred under ERISA. *See Brandt v. Grounds,* 687 F.2d 895, 898 (7th Cir.1982). Although plaintiffs have inadequately alleged injury resulting from the creation of the Stock Plan, and have failed to provide sufficient facts on the nature of the Plan, I cannot say that plaintiffs can "prove no set of facts in support of [their] claim" entitling them to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). Defendants' motions to dismiss is accordingly denied without prejudice to renewal on a full showing.

### D. Liability of Certain Defendants

Motions to dismiss and for summary judgment have been made by defendants MST, Cowles, Silha, Taylor, PBGC, and Prudential.

#### 1. MST Defendants

ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) provides that an individual is a fiduciary to the extent

(i) he exercises any discretionary authority or discretionary control respecting

management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. Such term includes any person designated under section 1105(c)(1)(B) of this title.

In support of its motion to dismiss, MST argues that its one-third ownership interest in Harper & Row prior to the September sale did not confer authority or control over Plan administration and assets to render MST a fiduciary within the definition of ERISA.

MST will incur liability as a fiduciary only to the extent that it exercised or had discretionary control over the employee benefit plans. The two possible avenues of control by MST are through its directors and through its shareholdings. MST as a shareholder could exercise control over the plans. However, although it voted on the actions concerning the plans at the annual shareholders' meeting on December 9, 1981, its vote had no impact because its shares were voted in proportion to the vote by all other shares voted at that meeting.

■ MST could exercise control over the employee benefit plans through two of its directors, Cowles and Silha, who were also directors of Harper & Row. A corporation is liable for the acts of its officers and directors committed in furtherance of the business of the corporation and in the scope of their employment. *See, e.g., United States v. Uniroyal, Inc.*, 300 F.Supp. 84, 95 (S.D.N.Y.1969). Because Cowles and Silha will remain as defendants for the reasons that follow, MST must also remain a defendant.

Defendants Cowles and Silha move to dismiss and for summary judgment on the basis that they are free from liability under ERISA because the termination of the pension plan was effective after they had resigned as directors. Plaintiffs assert that the Harper & Row and MST defendants acted "jointly" or that the MST defendants "knew" of or "acquiesced" to the actions of the Harper & Row defendants. *See, e.g.,* District 65 Complaint, ¶¶ 37, 62, 72; Harwood Complaint, at p. 24. MST, Cowles, and Silha join in the arguments advanced by Harper & Row in favor of the dismissal of plaintiffs' complaints in their entirety. Defendants argue alternatively that the complaints should be dismissed at least against Cowles, Silha, and MST.

Defendants Cowles and Silha argue that during the time they were on the Board of Directors of both MST and Harper & Row, they disassociated themselves from the Harper & Row Board of Directors in all discussions that related to the MST purchase. Further, Cowles and Silha assert that because they resigned on July 28, 1981 before the actual purchase of the MST shares by a contract dated September 15, 1981, any fiduciary obligations owed by Cowles and Silha ceased on that date.

■ Cowles and Silha would not be liable as fiduciaries for a breach of fiduciary duty occurring after they resigned as Harper & Row Directors in July 1981. ERISA § 409(b), 29 U.S.C. § 1109(b) provides in part that "[n]o fiduciary shall be liable with respect to a breach of fiduciary duty … if such breach was committed before he became a fiduciary or after he ceased to be a fiduciary." Although the contract for the sale of the MST shares was executed after Cowles and Silha submitted resignations, plaintiffs have submitted exhibits indicating that Cowles and Silha were aware of, and parties to discussions concerning the proposed financing of the MST purchase prior to their resignations. In a memorandum dated June 19, 1981 from Harper & Row's Brooks Thomas to Cowles and Silha, an earlier oral presentation to Cowles and Silha of the potential MST purchase was summarized. *See* Plaintiff District 65 Exh. 6. The proof may show that the defendants Cowles and Silha, before their resignations, set in motion the forces which caused the actual damage of which the plaintiffs

complain. Thus, issues of fact exist as to when the breach, if any, occurred.

Cowles and Silha also argue that they are not fiduciaries within the meaning of ERISA. It is unclear, however, whether they exercised insufficient or any discretionary authority or control over the employee plans while they were still Harper & Row Directors. In addition, if they are shown to be fiduciaries Cowles or Silha may be liable for the other fiduciary's breach under section 405(a)(3). 29 U.S.C. § 1105(a)(3). Their motion to dismiss, as well as MST's, is therefore denied.

■ Fred A. Taylor was named as a defendant in the Harwood action. Taylor was a director of Harper & Row until August 31, 1981 and a member of the Committee of Outside Directors appointed to review the advisability of Harper & Row's activities. Taylor moves to dismiss and for summary judgment on the ground that he was no longer a director of Harper & Row at the time of the September agreement or its approval by the Board in October. Plaintiffs argue that Taylor is liable for a breach of fiduciary duty relating to the events preceding his resignation. Plaintiffs argue also that Taylor is liable for failing to adequately provide for the continued management of the employee benefit plans after his resignation. For the same reasons that applied to the motions pertaining to Cowles and Silha, Taylor's motion to dismiss and for summary judgment is denied.

## 2. PBGC

PBGC moves to dismiss the District 65 complaint. In December 1981, the PBGC issued a Notice of Sufficiency to Harper & Row pursuant to ERISA § 4041(a), 29 U.S.C. § 1341(a), thereby authorizing the Plan termination to go forward. Plaintiffs allege that the issuance of the Notice of Sufficiency was improper because it was issued without a determination by PBGC that the Prudential offer was based on a reasonable interest rate or that participants would receive the true value of their accrued benefits. District 65 Complaint ¶ 98. District 65 stated in its Complaint that "[t]hrough correspondence and protests

from participants and beneficiaries of the Retirement Plan, and other information in its possession, PBGC knew, or should have known, that the termination ... was part of a fraudulent scheme ...." District 65 Complaint ¶ 103. The District 65 plaintiffs allege also that PBGC should have exercised its power under ERISA § 4047, 29 U.S.C. § 1347 to "cease the termination of the Retirement Plan and restore such Plan to active status." *Id.* PBGC argues in support of its motion to dismiss that it fulfilled its obligations in issuing the Notice of Sufficiency, that the power to restore a terminated plan is discretionary and that it was not even aware of the interest rate utilized by Prudential until May 1982.

■ Preliminarily, the PBGC challenges the standing of District 65 to proceed as a plaintiff against the PBGC. ERISA § 4003(f), 29 U.S.C. § 1303(f) provides that "[a]ny participant, beneficiary, plan administrator, or employee adversely affected by any action of the corporation ... may bring an action against the corporation." District 65 is not a plan participant, *see* ERISA § 3(7), 29 U.S.C. § 1002(7), nor a beneficiary, *see* ERISA § 3(8), 29 U.S.C. § 1002(8), nor a plan administrator, *see* ERISA § 3(16), 29 U.S.C. § 1002(16), and is not an "adversely affected employee." District 65 is an employee organization within the definition of ERISA § 3(4), 29 U.S.C. § 1002(4). ERISA listed the individuals and entities permitted to sue the PBGC for relief. Employee organizations are not on the list. District 65 therefore has no standing and is dismissed as a plaintiff on the claims asserted against the PBGC. *Cf., Utility Workers Union v. Consumers Power Co.*, 453 F.Supp. 447, 450 (E.D.Mich.1978) (employee organization has no standing under ERISA § 502), *aff'd*, 637 F.2d 1082 (6th Cir.1981), *vacated on other grounds*, 451 U.S. 1014, 101 S.Ct. 3000, 69 L.Ed.2d 385 (1980). The individual plaintiffs in the District 65 action, however, are proper plaintiffs under ERISA § 4003(f), 29 U.S.C. § 1303(f). *Id..*

ERISA § 4041(b), 29 U.S.C. § 1341(b) provides that "[i]f the corporation deter-

mines that ... the assets held under the plan are sufficient to discharge when due all obligations of the plan, it shall notify the plan administrator ...." The above provision does not require the PBGC to review any other factors other than the sufficiency of the plan assets in its consideration of an application for a Notice of Sufficiency. Further, PBGC's authority to "cease any activities undertaken to terminate the plan and to take whatever action necessary" and restore the plan is discretionary. ERISA § 4047, 29 U.S.C. § 1347.

 Issues of fact nevertheless preclude the granting of PBGC's motion to dismiss. First, although District 65 alleges and PBGC concurs that PBGC was not aware that a 15 percent interest rate was being utilized until May, factual issues exist concerning what, if any, actions PBGC could have taken at that point. Although the power to restore a plan is discretionary, when PBGC was made aware of the utilization of the 15 percent interest rate, it may have been an abuse of that discretion to deny restoration. Taking the facts alleged in the District 65 complaint as true, District 65 Complaint, ¶¶ 97–100, I must deny the motion to dismiss.

In sum, PBGC's motion to dismiss District 65 as a party plaintiff against PBGC is granted. The individual plaintiffs in the District 65 action, however, remain and PBGC's motion to dismiss their complaint is denied.

3. Prudential Insurance Company of America

 Prudential moves to dismiss and for summary judgment in the District 65 action. Prudential did not file any memorandum in support of its motions to dismiss and for summary judgment. Instead, it relies on the papers submitted by Harper & Row. Harper & Row's arguments in support of its motions to dismiss and for summary judgment will not be reiterated or discussed here.

Prudential's motions to dismiss and for summary judgment on the claims asserted by the District 65 plaintiffs against Prudential are denied. Prudential has not submitted any papers in support of its motion to dismiss the complaint against Prudential. Assuming Prudential's argument is that it is not a fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), it is difficult to see how Prudential could be deemed a fiduciary under the facts of this case. It does not appear that Prudential exercised any discretion or control over the assets of the Plan. *Compare Chicago Board Options Exchange, Inc. v. Connecticut General Life Insurance Co.*, 713 F.2d 254, 260 (7th Cir.1983). On the other hand, plaintiffs allege that "[d]efendant Prudential was aware at the time it negotiated the group annuity contract that Harper & Row was deliberately attempting to minimize the amount" to be paid to the Plan's participants and beneficiaries. District 65 Complaint ¶ 52.

Issues of fact that concern the extent of control, if any, exercised by Prudential over the assets of the Plan and the role of Prudential in the assumption of the 15 percent interest rate remain to be resolved. Accordingly, Prudential's motions are denied.

E. Securities Laws Claims

District 65 asserts claims under section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), and sections 10(b) and 14(a) of the Securities and Exchange Act of 1934, 15 U.S.C. 78j(b) and 15 U.S.C. § 78n(a), against defendants with the exception of defendants PBGC and Prudential. The District 65 plaintiffs also assert state securities claims under the Martin Act, New York General Business Law § 352–c.[14]

Defendants move to dismiss the federal securities claims on the grounds that plaintiffs fail to allege any actionable fraud and

---

**14.** Section 352–c provides in part that it is illegal to use "[a]ny fraud, deception, concealment, suppression, false pretense or fictitious or pretended purchase or sale ... where engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation or purchase within or from this state of any securities ...." N.Y. Gen.Bus.Law § 352–c (McKinney 1968). Plaintiff District 65's Claim XIV is dismissed.

fail to satisfy the purchaser/seller requirement under section 10(b) and Rule 10b–5. Defendants move to dismiss the plaintiffs' Martin Act claims on the ground that ERISA preempts those claims. For the reasons that follow, District 65's securities claims are dismissed.

1. Section 14(a) and Proxy Rule 14a–9

District 65 claims that the Harper & Row and MST defendants violated the Securities Exchange Act § 14(a), 15 U.S.C. § 78n(a), and Rule 14a–9, 17 C.F.R. § 240.14a–9 by causing "a solicitation by a proxy statement which contained statements which, at the time and in the light of the circumstances under which they were made, were false and misleading with respect to material facts." District 65 Complaint ¶ 109.

The proxy statement distributed to the shareholders on November 10, 1981 reviewed the proposed stock purchase and Employee Stock Plan. *See* Miller Affidavit, Exh. A. The District 65 plaintiffs allege basically three violations of section 14(a) and the Proxy Rules. Plaintiffs allege that the defendants' statements were false and misleading because (1) the actions were represented to be beneficial to the corporation when in fact they were not; (2) the Board of Directors never considered alternatives to the MST purchase; and (3) the Directors failed to disclose that the Prudential contract and MST purchase were undertaken in violation of defendants' fiduciary duties.

For the following reasons, plaintiffs' claims under section 14(a) and the Proxy Rules are dismissed for failure to state a claim upon which relief can be granted.

▪ First, the District 65 plaintiffs were not shareholders at the time of the purported solicitation. *See J.I. Case v. Borak,* 377 U.S. 426, 432, 84 S.Ct. 1555, 1559, 12 L.Ed.2d 423 (1964). Second, the Proxy Rules do not require the disclosure of the motives behind certain proposals. *See Lewis v. Oppenheimer & Co.,* 481 F.Supp. 1199, 1204 (S.D.N.Y.1979) (securities laws require disclosure of facts not motives); *see also Panter v. Marshall Field & Co.,* 646 F.2d 271, 290 (7th Cir.), *cert. denied,*

454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981).

Third, plaintiffs have not stated a Proxy Rule violation claim based on its second assertion that defendants did not adequately consider alternatives to the MST purchase. Defendants were not required to disclose the "panoply of possible alternatives" to the action it was proposing to the stockholders. *See Umbriac v. Kaiser,* 467 F.Supp. 548, 553 (D.Nev.1979).

▪ Fourth, the failure to disclose that defendants breached their fiduciary duties does not constitute an omission within the contemplation of section 14(a). *See Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co.,* 476 F.2d 687, 697 (2d Cir.1973); *Nemo v. Allen,* 466 F.Supp. 192, 195 (S.D.N.Y.1979) (disclosure requirement under section 14(a) requires only that the basic facts be disclosed so as to enable stockholders to make their own decisions). The District 65 plaintiffs' Claim XIII under the Securities Exchange Act § 14(a) and Rule 14a–9 is therefore dismissed.

2. Section 10(b)

▪ District 65 alleges that the defendants "have employed a device, scheme and artifice to defraud; have omitted to state numerous material facts ..., have engaged in acts, practices and courses of business which operate or would operate as fraud or deceit on plaintiffs in connection with the purchase of a security" thereby violating the federal securities laws. District 65 Complaint ¶ 107. *See* Securities Act § 17(a), 15 U.S.C. 77q(a); Securities Exchange Act § 10(b), 15 U.S.C. § 78j(b); Rule 10b–5, 15 C.F.R. § 240.10b–5.

Plaintiffs' claims under section 10(b) of the Securities Exchange Act of 1934 and the Rules promulgated thereunder are dismissed for the following reasons. Plaintiffs fail to satisfy the purchaser-seller requirement of section 10(b) of the Securities Exchange Act. 15 U.S.C. § 78j(b); *see Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 731–33, 95 S.Ct. 1917, 1923–24, 44 L.Ed.2d 539 (1975). The plaintiffs in the District 65 action are District 65, a

labor union and Renee Cafiero and William Monroe, employees of Harper & Row and participants in the Retirement Plan, the Profit-Sharing Plan and the Employee Stock Plan. They are not purchasers or sellers of the MST shares.

Furthermore, plaintiffs' claims assertedly interposed under the federal securities laws appear to allege nothing more than a ·breach of fiduciary duty. *See Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 477, 97 S.Ct. 1292, 1302, 51 L.Ed.2d 480 (1977). The Supreme Court has stated that: "the existence of this comprehensive legislation governing the use and terms of employee pension plans [ERISA] severely undercuts all arguments for extending the Securities Acts to non-contributory, compulsory pension plans." *International Brotherhood of Teamsters v. Daniel,* 439 U.S. 551, 569–70, 99 S.Ct. 790, 801–802, 58 L.Ed.2d 808 (1979). Here, also, I see no reason for extending the reach of the federal securities laws to cover the circumstances of this case.

Finally, the challenged activity, "if carved out as alleged in the [District 65] complaint, was neither deceptive nor manipulative and therefore did not violate either section 10(b) of the Act or Rule 10b–5." *Santa Fe Industries, Inc. v. Green,* 430 U.S. at 474, 97 S.Ct. at 1301.[15] Accordingly, District 65's claim XII is dismissed.

**F. Miscellaneous Claims**

▇▇▇ The complaints, especially the District 65 amended complaint, contain common-law allegations such as unjust enrichment, fraud, and conversion. The state common-law causes of action asserted by plaintiffs are dismissed because they have been preempted by ERISA § 514.

ERISA § 514(a) states that the "provisions of this title ... shall supercede any and all state laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). Thus, ERISA preempts all direct and indirect intrusions into the employee benefit plan area. *See Alessi v. Raybestos-Manhattan, Inc.,* 451 U.S. 504, 525–26, 101 S.Ct. 1895, 1907–1908, 68 L.Ed.2d 402 (1981). Claims V (conversion) and VII (unjust enrichment) in the Harwood complaint are dismissed and District 65 Claims XV (common law fraud) and XVI (tortious interference with contract) are dismissed. *See also Dependahl v. Falstaff Brewing Corp.,* 653 F.2d 1208, 1214–16 (8th Cir.) (Congress preempted all state laws which relate to employee benefit plans including state claim for tortious interference with contractual relationships), *cert. denied,* 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981).

Claim XVII in the District 65 complaint asserted under ERISA· § 510, 29 U.S.C. § 1140 is dismissed. This section covers conduct in retaliation to the exercise of rights under ERISA and is totally irrelevant under the facts of this case.

▇▇▇ Defendants' motion to dismiss plaintiffs' claims asserted under ERISA § 502(c), 29 U.S.C. § 1132(c) is denied. The Harwood plaintiffs allege that defendants violated section 502(c) by failing to comply with requests made by participants for information concerning the interest rate and for Plan documents. *See* Harwood Claim IV; ¶ 36. Plaintiffs have alleged facts,

---

**15.** Plaintiffs' claim under section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q, is also dismissed for failure to state an actionable claim. Section 17(a) is "intended to protect purchasers of securities from deceptive acts or omissions by persons 'in the offer or sale of any securit[y].'" *Parness v. Lieblich,* 489 F.Supp. 889, 892 (S.D.N.Y.1980) (citing *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 734 n. 6, 95 S.Ct. 1917, 1924 n. 6, 44 L.Ed.2d 539 (1974)). The District 65 plaintiffs are not in any form purchasers of Harper & Row securities. Accordingly, the claims purportedly asserted under section 17(a) are dismissed.

Similarly, plaintiffs' claims under the Martin Act are dismissed for the same reasons for the dismissal of the section 10(b) claims. *See Superintendent of Insurance v. Freedman,* 443 F.Supp. 628, 637 (S.D.N.Y.1977) (352–c is no broader than 10(b)), *aff'd, mem.,* 594 F.2d 852 (2d Cir.1978), *reversed on other grounds,* 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971); *Corporate Finders and Consultants, Inc. v. Universal Container Corp.,* 39 A.D.2d 533, 330 N.Y. S.2d 862, 863 (1st Dep't 1972) (352–c requires purchaser/seller).

presumed to be true under a motion to dismiss, sufficient to state a cause under this section.

The District 65 plaintiffs include claims under federal labor law and the Internal Revenue Code in their amended complaint. *See* District 65 Complaint Claims XVIII, XIX. Plaintiffs allege that defendants' arrangement with Prudential discriminated against "lower paid, younger" employees thereby violating the collective bargaining agreement between Harper & Row and District 65 and the Internal Revenue Code § 401(a)(4), 26 U.S.C. § 401(a)(4). Section 401(a)(4) prohibits discrimination in favor of officers, shareholders, supervisors, or highly compensated employees. Taking the facts alleged by the District 65 plaintiffs as true, defendants' motions to dismiss the IRC claims are denied. The allegations under IRC § 401 are interwoven with the ERISA claims concerning the use of the 15 percent interest rate.

District 65's claim for breach of the collective bargaining agreement between Harper & Row and District 65 is dismissed for failure to exhaust nonjudicial remedies. *See International Holders and Allied Workers Union v. Aquarius Shoe Corp.*, 511 F.Supp. 361, 364 (E.D.Mo.1981).

G. Conclusion

Procedurally, the Harwood and District 65 actions are consolidated. A determination as to whether the action will proceed as a class action is postponed until plaintiffs submit information concerning the size and composition of the class and plausible suggestions for the means of notification to all members of the class. District 65's motion to amend its complaint is granted. District 65 is dismissed as plaintiff on its ERISA claims and its claim against PBGC but the individual plaintiffs in that action are proper plaintiffs. The motions to dismiss by defendants MST, Cowles, Silha, Taylor, PBGC, and Prudential are denied.

Substantively, plaintiffs' claims for breach of fiduciary duty based on the termination of the Plan and reversion of surplus assets to Harper & Row are dismissed.

Plaintiffs' claims arising out of the amendment to the Profit-Sharing Plan are dismissed. District 65's claims under the securities laws, state common law, the retaliatory provision in ERISA, and for breach of the collective bargaining agreement are dismissed. Plaintiff District 65's motion for summary judgment is denied.

SO ORDERED.